# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-01558-SCT

*THE MISSISSIPPI METHODIST HOSPITAL AND*
*REHABILITATION CENTER, INC. d/b/a*
*METHODIST SPECIALTY CARE CENTER*

*v.*

*MISSISSIPPI DIVISION OF MEDICAID AND*
*ROBERT L. ROBINSON, IN HIS OFFICIAL*
*CAPACITY AS DIRECTOR OF MISSISSIPPI*
*DIVISION OF MEDICAID*

DATE OF JUDGMENT:                    09/11/2008
TRIAL JUDGE:                         HON. J. DEWAYNE THOMAS
COURT FROM WHICH APPEALED:           HINDS COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:             THOMAS L. KIRKLAND, JR.
                                     TAMMY MIDDLETON VOYNIK
                                     ANDY LOWRY
                                     ALLISON C. SIMPSON
ATTORNEY FOR APPELLEES:              CHARLES PALMER QUARTERMAN
NATURE OF THE CASE:                  CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                         REVERSED AND REMANDED - 09/24/2009
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.     The Mississippi Division of Medicaid (DOM) amended its regulations, known as the

"State Plan," to reduce the reimbursement rate applicable to private nursing facilities for the

severely disabled (PNFSDs). Specifically, State Plan Amendment 2006-006 (SPA 2006-006)

placed a ceiling on the Medicaid reimbursement of a PNFSD for its administrative and

operating costs. The only PNFSD in Mississippi is the Methodist Specialty Care Center, a division of the Mississippi Methodist Hospital and Rehabilitation Center (Methodist).

¶2. Aggrieved by the amendment reducing the reimbursement for its PNFSD, Methodist exhausted its administrative remedies with DOM and then appealed to the Chancery Court of Hinds County. The chancery court affirmed DOM's decision, and Methodist timely appealed to this Court. Methodist argues that SPA 2006-006 violated a statute that requires DOM to reimburse PNFSDs "as a separate category of nursing facilities." Miss. Code Ann. § 41-13-117(44)(b) (Rev. 2004). Methodist also argues that, because DOM failed to comply with the notice provisions of either the Administrative Procedures Act or of the State Plan, the amendment is invalid.

¶3. This Court finds Methodist's first issue to be dispositive. We find that SPA 2006-006 violates the statutory requirement that a PNFSD be reimbursed as a separate category of nursing facility; consequently, it is void and of no effect. Therefore, we reverse the decisions of the chancery court and DOM, and we remand this case to the chancery court for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶4. In 1998, the Mississippi Legislature awarded Methodist a certificate of need to provide nursing facility services for the severely disabled. In 2001, the Legislature enacted a provision for the Medicaid reimbursement of Methodist's PNFSD. The provision stated:

> Medicaid as authorized by this article shall include payment of part or all of the costs, at the discretion of the division, with approval of the Governor, of the following types of care and services rendered to eligible applicants who have been determined to be eligible for that care and services, within the limits of state appropriations and federal matching funds:

2

(44) Nursing facility services for the severely disabled.

       (a) Severe disabilities include, but are not limited to, spinal cord injuries, closed head injuries and ventilator dependent patients.

       (b) Those services must be provided in a long-term care nursing facility dedicated to the care and treatment of persons with severe disabilities, and shall be reimbursed as a separate category of nursing facilities.

Miss. Code Ann. § 43-13-117 (Rev. 2004).

¶5.    Subsequent to the enactment, DOM proposed a payment methodology for Methodist that provided that no cost ceilings would be applied to Methodist's Medicaid reimbursement until another PNFSD participated in the Medicaid program. Accordingly, DOM amended the State Plan to provide the following reimbursement for PNFSDs: "In years when the rate is calculated for only one PNFSD, reimbursement will be based upon allowable reported costs of the facility. Reimbursement for direct care, therapies, care related, and administrative and operating costs will be made at cost plus the applicable trend factors." Thus, no ceiling was applied to Methodist's reimbursement for any of the various expense categories, which include direct-care costs, therapies costs, care-related costs, and administrative and operating costs.[1]

--------

[1] A schedule included in the record breaks down a long-term care facility's expenses by category:

Direct-care expenses include salaries and benefits for aides, LPNs, RNs, and feeding assistants; drugs; direct-care medical supplies; medical-waste disposal; and other listed expenses.

Care-related expenses include food; the salaries and benefits for the director of nursing, the assistant director of nursing, the pharmacy, and social services; care-related supplies; the allowable costs for uniforms and barber and beauty expenses; consultant fees; and other listed expenses.

Therapies costs include costs attributable to occupational, speech, and other

3

¶6. The State Plan provides for the use of each specific class of long-term care facilities "as a basis for evaluating the reasonableness of an individual provider's costs." State Plan, Attachment 4.19D, 1-2. The specific classes are: small nursing facilities (1-60 beds); large nursing facilities (61 or more beds); PNFSDs; Residential Psychiatric Treatment Facilities (PRTF); and Intermediate Care Facilities for the Mentally Retarded. (ICF-MR). State Plan, Attachment 4.19D, 1-2. The State Plan provides that "[i]t is the intent of the Division of Medicaid to reimburse nursing facilities at a rate that is adequate for an efficiently and economically operated facility." State Plan, Attachment 4.19D, 3-1.[2]

¶7. Methodist filed a reply brief in chancery court, with attachments from a prior proceeding, that supplies information relevant to the current dispute. Methodist opened its PNFSD in February 2004; it experienced a low initial patient occupancy rate of 26.34 percent. In January 2005, Methodist submitted a cost report to DOM that claimed $1,106.68 per patient per day. Of this amount, $454.42 was claimed for administrative and operating costs. Medicaid challenged Methodist's rate of reimbursement at a November 21, 2005, hearing.

therapists.

Administrative and operating costs include administrative salaries and benefits, certain contract expenses, accounting fees, auto leases, bank service charges, board of directors' fees, dietary supplies, depreciation, dues, educational seminars and training, housekeeping supplies, professional liability and other insurance, laundry supplies, linen and laundry alternatives, management fees and home office costs, nonemergency medical transportation, office supplies and subscriptions, postage, taxes and licenses, telephone and communications, travel, utilities, and other listed expenses.

[2] "An efficiently and economically operated facility is defined as one with direct care and care related costs greater than 90% of the median and less than the maximum rate, therapy costs of PNFSD less than the maximum rate, administrative and operating costs of less than the maximum rate, property costs that do not require a payment of the hold harmless provision and an occupancy rate of 80% or more." State Plan, Attachment 4.19D, 3-1.

4

At the hearing, a DOM employee expressed concern that Methodist's costs per patient per day were too high. Medicaid sought to reimburse Methodist at a rate of $650 per diem. However, Medicaid subsequently performed a field audit that concluded that a reasonable per diem reimbursement rate for Methodist from February 27, 2004, to July 1, 2006, ranged between $989.52 and $1,156.15.[3] On August 24, 2006, DOM confirmed the adjustment of the reimbursement rates in accordance with the audit.

¶8.    On August 1, 2006, DOM promulgated State Plan Amendment 2006-006 (SPA 2006-006) to amend the rules applicable to the reimbursement of PNFSDs. The PNFSD reimbursement provision now stated:

> In years when the rate is calculated for only one PNFSD, reimbursement will be based upon allowable reported costs of the facility. Reimbursement for direct care, therapies, care-related, and administrative and operating costs will be calculated at cost plus the applicable trend factors. *Reimbursement for administrative and operating costs will be subject to the ceiling for the facility as described in Section 3-4E.*

(Emphasis applied to amended language.) Section 3-4E, governing the per diem rate for administrative and operating costs, was amended to state: "For PNFSD's with 60 Medicaid certified beds or less, the ceiling calculated for the small nursing facility class will be used. For PNFSD's with greater than 60 Medicaid certified beds, the large nursing facility class will be used." Thus, SPA 2006-006 applied the reimbursement ceiling for either a small or a large nursing facility's administrative and operating costs to a PNFSD's administrative and

---

[3] In its reply brief, Methodist states that its reimbursement would be significantly less today than it was at start-up.

operating costs.[4]  After SPA 2006-006, DOM calculated a per diem reimbursement rate for Methodist of $511.01.

¶9.      DOM promulgated notice of the amendment by following the procedure prescribed by the Administrative Procedures Act (APA).  As required by the APA, at least twenty-five days prior to the adoption of SPA 2006-006, DOM filed notice of the proposed rule adoption with the Secretary of State for publication in the administrative bulletin.  Miss. Code Ann. § 25-43-3.103(1) (Rev. 2006).  The APA also requires an agency to mail a copy of the proposed rule change to any agency that has timely requested notice of proposed rule adoptions.  Miss. Code Ann. § 25-43-3.103(2).  This must be done within three days after filing with the Secretary of State.  *Id.*  Methodist did not request notice of proposed rule adoptions.  However, further notice requirements were imposed upon DOM by the State Plan, which provides that all nursing facilities will receive a copy of the public notice of any significant proposed change to payment rates.  State Plan, Attachment 4.19D, 1-8.  Despite this regulation, DOM did not mail Methodist a copy of the proposed SPA 2006-006 before its adoption.  Instead, Methodist first received notice of SPA 2006-006 in a January 30, 2007, letter that advised Methodist of its reduced reimbursement beginning in January 2007.

¶10.     On February 27, 2007, Methodist filed a request for an appeal with DOM.  Methodist argued that: (1) SPA 2006-006 did not comply with Section 43-13-117(44), which requires

_____

[4] Methodist asserts that given its number of beds, it is subject to the reimbursement ceiling for the small nursing facility class.  For the sake of brevity, the Court refers to the small nursing facility ceiling throughout our analysis, although if Methodist exceeded the sixty-bed limit for the small nursing facility class, then under SPA 2006-006, the ceiling for the large nursing facility class would apply.

DOM to reimburse Methodist as a separate category of nursing facilities, (2) SPA-2006-006 was not a reasonable interpretation of the statute, and (3) SPA-2006-006 was void due to DOM's failure to afford proper notice to Methodist. On December 7, 2007, a hearing officer ruled in favor of DOM. The hearing officer found that SPA 2006-006 allowed DOM to reimburse Methodist as "a separate category of nursing facility" because, unlike any other type of facility, Methodist still had no ceiling for direct-care or care-related costs. The hearing officer found that DOM's administrative and operating costs were unreasonable, and that "DOM's actions allow Methodist to recover its reasonable administrative and operating costs by comparing its administrative and operating costs to a facility of similar size." The hearing officer found that DOM had provided adequate notice of SPA 2006-006 under the APA. DOM adopted the hearing officer's determinations as the final agency decision.

¶11. On January 2, 2008, Methodist filed a complaint in the Chancery Court of Hinds County. Methodist alleged that the ceiling "substantially and drastically lowers Methodist's reimbursement for administrative and operating costs (from $319.24 per day to $74.22) and it directly contradicts the plain language of both the statute and the [State] Plan which require that Methodist be treated as a separate category of nursing homes for purposes of reimbursement." Methodist also argued that it was denied due process because it had not received notice of the proposed rule change until after the rule's adoption. Methodist requested various forms of relief, including a permanent injunction to prevent DOM from imposing a payment ceiling that does not treat Methodist as a separate category of nursing facility until the opening of a second PNFSD facility.

7

¶12.    The chancery court affirmed DOM's decision.  The chancery court's decision is perhaps the best articulation of the reasoning employed by DOM; it stated:

> The primary claim asserted by Methodist is that SPA 2006-006 violates statutory law because it placed Methodist in the same category as another type of nursing home.  It is true that the reimbursement ceiling imposed in SPA 2006-006 is the same as that imposed in "the small nursing facility class."  It is further true that the relevant statute directs that PNFSD services "shall be reimbursed as a separate category of nursing facilities."  However, it is not true that SPA 2006-006 is a violation of this statutory mandate.  While SPA 2006-006 imposes a ceiling on administrative and operating costs like other classes of nursing facilities, Methodist is not subject to direct care and care-related costs ceilings like other classes of nursing facilities.  Further, Methodist, unlike other nursing facilities, is allowed to recoup its costs related to the special facilities and equipment required to treat the acute needs of its patients.  Therefore, it is obvious that the rate calculation for Methodist differs from the rate calculations for any other nursery [sic] facilities.  Methodist alleges that no facet of its reimbursement may be on the same basis as any other category of nursing facility.  However, the plain language of the statute simply does not support this assertion . . . .  Clearly, the statute simply does not require that every component of reimbursement be determined as a completely separate entity from all other nursing facilities.  Instead, the language provides that reimbursement shall be had as a separate category of nursing facilities.  Clearly, Medicaid does reimburse Methodist as a separate category of nursing facility.  In short, SPA 2006-006 provides a ceiling only for administrative and operating costs; Methodist is still treated as a separate class of facility as required by law.

The chancellor also found that, although DOM had violated its regulatory notice provision, because DOM's notice of the proposed rule change had complied with the minimal due process requirements prescribed by the APA, the chancery court could not invalidate SPA 2006-006.

¶13.    Methodist appeals, arguing that SPA 2006-006 violates Mississippi Code Section 43-13-117(44).  Methodist also argues that SPA 2006-006 is invalid because DOM adopted it in violation of its own regulatory notice provision, and without providing Methodist with notice and an opportunity to be heard.

8

## STANDARD OF REVIEW

¶14.    We will reverse the decision of an administrative agency only if the decision (1) was unsupported by substantial evidence; (2) was arbitrary and capricious; (3) was beyond the power of the administrative agency to make; or (4) violated the complaining party's statutory or constitutional right. *Hinds County Sch. Dist. Bd. of Trs. v. R.B. ex rel. D.L.B.*, 10 So. 3d 387, 394-95 (Miss. 2008).  An agency may not adopt rules and regulations which are contrary to statutory provisions or which exceed or conflict with the authority granted by statute. *Miss. Pub. Serv. Comm'n v. Miss. Power & Light Co.*, 593 So. 2d 997, 1000, 1004 (Miss. 1991). "[A]n agency's rule-making power does not extend to the adoption of regulations which are inconsistent with actual statutes." *Tillmon v. Miss. State Dep't of Health*, 749 So. 2d 1017, 1023 (Miss. 1999) (citing *State ex rel. Pittman v. Miss. Public Serv. Comm'n*, 538 So. 2d 367, 373 (Miss. 1989)).

¶15.    An agency's interpretation of a rule or statute governing the agency's operation is a matter of law that is reviewed de novo, but with great deference to the agency's interpretation. *Sierra Club v. Miss. Envtl. Quality Permit Bd.*, 943 So. 2d 673, 678 (Miss. 2006) (quoting *McDerment v. Miss. Real Estate Comm'n*, 748 So. 2d 114, 118 (Miss. 1999)).  This "duty of deference derives from our realization that the everyday experience of the administrative agency gives it familiarity with the particularities and nuances of the problems committed to its care which no court can hope to replicate." *Gill v. Miss. Dep't of Wildlife Conservation*, 574 So. 2d 586, 593 (Miss. 1990).  However, if an agency's interpretation is contrary to the unambiguous terms or best reading of a statute, no deference is due. *Sierra Club*, 943 So. 2d at 679.  An agency's interpretation will not be upheld if "it is so plainly erroneous or so

9

inconsistent with either the underlying regulation or statute as to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Buelow v. Glidewell*, 757 So. 2d 216, 219 (Miss. 1995).

## ANALYSIS

### I. WHETHER BY ADOPTING SPA 2006-006, DOM FAILED TO REIMBURSE METHODIST AS A SEPARATE CATEGORY OF NURSING FACILITY, IN VIOLATION OF SECTION 43-13-117(44).

¶16. Methodist argues that SPA 2006-006 violates the plain language of Mississippi Code Section 43-13-117(44) that requires DOM to reimburse Methodist as a separate category of nursing facilities. Methodist claims the clear legislative intent was that DOM would subject Methodist to a reimbursement scheme tailored to its particular role as a PNFSD. Methodist argues, "[b]ecause the ceiling for small nursing facilities is an average of their actual costs, which are incurred in the administration and operation of facilities whose patients are not nearly so ill or so challenging as those at Methodist's facility for the severely disabled, such a ceiling can only reduce Methodist's reimbursement, and is derived from the costs of a different category of nursing home that is not subject to Methodist's particular needs." Therefore, Methodist argues, SPA 2006-006 effectively makes Methodist reimbursable as a small nursing facility, not a PNFSD. Methodist takes issue with DOM's determination that the statutory requirement is satisfied as long as Methodist's reimbursement method does not mirror precisely that of another type of facility.

¶17. DOM argues that, because ceilings for direct-care and care-related costs apply to other facilities but not to Methodist, Methodist is still being reimbursed as a separate category of nursing facility, although it now shares the ceiling for administrative and operating costs with

10

the small nursing facility category. DOM argues that the plain language of Mississippi Code Section 43-13-117(44) does not require that every aspect of a PNFSD's reimbursement be separate from that of another category of facility. DOM also argues that it was reasonable for DOM to assign the small nursing facility ceiling for administrative and operating costs to a PNFSD. DOM contends that, while it is reasonable to expect Methodist to have higher costs for direct-care and care-related services due to its acute-care patients, it is unreasonable for Methodist to have higher costs for administration and operation than those of a similarly-sized ordinary nursing facility.

¶18. We turn to Section 43-13-117(44). This Court will not engage in statutory interpretation if a statute is plain and unambiguous. *In re Guardianship of Duckett*, 991 So. 2d 1165, 1181 (Miss. 2008) (citing *DuPree v. Carroll*, 967 So. 2d 27, 30 (Miss. 2007)). However, statutory interpretation is appropriate if a statute is ambiguous or is silent on a specific issue. *Id.* In either case, the ultimate goal of this Court is to discern the legislative intent. *Allred v. Yarborough*, 843 So. 2d 727 (Miss. 2003) (quoting *City of Natchez v. Sullivan*, 612 So. 2d 1087, 1089 (Miss. 1992)). The best evidence of legislative intent is the text of the statute; the Court may also look to the statute's historical background, purpose, and objectives. *In re Duckett*, 991 So. 2d at 1181-82. If a statute is ambiguous, it is the Court's duty to "carefully review statutory language and apply its most reasonable interpretation and meaning to the facts of a particular case." *Caldwell v. N. Miss. Med. Ctr.*, 956 So. 2d 888, 891 (Miss. 2007) (quoting *Pope v. Brock*, 912 So. 2d 935, 937 (Miss. 2005)).

¶19. Section 43-13-117(44) provides that "nursing facility services for the severely disabled" are to be provided in "a long-term care nursing facility dedicated to the care and

treatment of persons with severe disabilities." This facility "shall be reimbursed as a separate category of nursing facilities." Miss. Code Ann. § 43-13-117(44) (Rev. 2004). We find that Section 43-13-117(44) is subject to interpretation, because it is silent on the specific issue of whether or not placing another facility's ceiling on one component of a PNFSD's reimbursement means that the PNFSD is being reimbursed as "a separate category of nursing facilities." *See In re Duckett*, 991 So. 2d at 1181.

¶20. This Court defers to an administrative agency's interpretation of a governing statute. *Sierra Club*, 943 So. 2d at 678. DOM has determined that SPA 2006-006 does not conflict with Section 43-13-117(44) because it makes only one component of Methodist's reimbursement the same as that of another category of nursing facility. However, DOM admits that the legislative intent of Section 43-13-117(44) was to recognize the special needs of a PNFSD by providing for the reimbursement of a PNFSD as "a separate category of nursing facilities." DOM argues that this legislative intent was satisfied by DOM's use of another category's ceiling to reimburse Methodist's administrative and operating costs.

¶21. Although we give deference to DOM's interpretation, it will not be upheld if "it is so plainly erroneous or so inconsistent with either the underlying regulation or statute as to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Buelow*, 757 So. 2d at 219. When reasonable, this Court is obliged to reach an interpretation that gives effect to all of the statutory language. *Gilmer v. State*, 955 So. 2d 829, 835 (Miss. 2007). Mississippi Code Section 43-13-117(44) was enacted to provide for the Medicaid reimbursement of services provided to severely disabled patients at long-term nursing care facilities dedicated to the care and treatment of those patients, known as PNFSDs. The State

12

Plan lists several specific categories of facilities and promulgates reimbursement methodologies applicable to the categories. The Legislature saw fit to provide for the reimbursement of a PNFSD "as a separate category of nursing facilities." We find that the provision that a PNFSD shall be reimbursed as "a separate category of nursing facilities" is best viewed as a legislative determination that a PNFSD is not comparable to another category of nursing facility for reimbursement purposes. Otherwise, the Legislature could have omitted this provision, and DOM would have been able to place PNFSDs into another reimbursement category.

¶22.　This Court finds that DOM's interpretation of Section 43-13-117(44) is inconsistent with that statute's requirement that DOM reimburse Methodist as a separate category of nursing facility. DOM contends that, so long as Methodist is reimbursed in a manner unlike that of any other nursing facility, DOM may utilize ceilings applicable to other facility categories without running afoul of the statute. Simultaneously, DOM admits that it would be unreasonable for DOM to apply the small nursing facility ceilings for direct-care and care-related costs to Methodist due to Methodist's special role in caring for the severely disabled. Yet, under DOM's interpretation of the statute, nothing prevents DOM from placing the small nursing facility ceilings upon Methodist's direct-care and care-related costs, because as long as therapies costs were not subject to a ceiling, Methodist's reimbursement still would be unlike that of any other facility. Therefore, carried to its logical end, DOM's interpretation yields absurd results by rendering the "separate category of nursing facilities" language virtually meaningless. This interpretation contravenes the evident legislative intent that DOM evaluate the needs of a PNFSD separately for reimbursement purposes. We recognize that

13

there certainly is no statutory restriction preventing DOM from curtailing Methodist's reimbursement, whether through ceilings or otherwise. However, under Section 43-13-117(44), any ceiling or other limitation must be one calculated for a PNFSD, not for another type of nursing facility.[5]

¶23.  We also address Methodist's argument that DOM's application of a ceiling to costs previously not subject to a ceiling was arbitrary and capricious because "an agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent." *Miss. Valley Gas Co. v. Fed. Energy Reg. Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981). Methodist contends that if DOM believed Methodist's costs to be unreasonable, then the appropriate remedy under the State Plan would have been a field audit followed by an adjustment to allowable costs. *See* State Plan, Attachment 4.19D, 1-7(A). Methodist points out that DOM already had performed a field audit, which concluded that Methodist's costs were reasonable. Therefore, Methodist argues that DOM's motivation in promulgating SPA 2006-006 was to rewrite its regulations to obtain the result it was unable to obtain by following its extant rules. DOM recognizes that "an agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent," but it asserts

---

[5] The dissent accuses this Court of failing to afford proper deference to Medicaid. Regarding the interpretation of statutes, it is the Legislature, not Medicaid, that is entitled to our ultimate deference. While this Court is well-aware of the problems currently experienced by the Medicaid system, it is the role of the Legislature, not this Court, to shield the public from Medicaid over-billing. It would be improper for this Court to undertake that substantial task at the expense of established principles of agency law and statutory interpretation. We note that Medicaid remains free to curtail Methodist's administrative and operating costs reimbursement by placing a ceiling upon Methodist's administrative and operating costs that is not tied to another category's ceiling.

that the reason for its adoption of SPA 2006-006 was that Methodist's reported administrative costs were "grossly out of line with reasonable costs."

¶24.   We agree that "an agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent." *Miss. Valley Gas Co.*, 659 F.2d at 506.  DOM argues that it promulgated SPA 2006-006 because it determined that Methodist's administrative and operating costs were unreasonably high.  However, this conclusion is cast into doubt by the fact that Methodist's reported costs were found to be reasonable by DOM's own internal audit.[6]  It appears that the amendment was adopted for the purpose of limiting the reimbursement for administrative and operating costs that DOM already had deemed reasonable.

¶25.   In *Beverly Enterprises v. Mississippi Division of Medicaid*, 808 So. 2d 939, 943 (Miss. 2002), this Court examined the definitions of "arbitrary" and "capricious," and stated:

> In *McGowan v. Miss. State Oil & Gas Bd.*, 604 So. 2d 312, 322 (Miss. 1992), this Court defined arbitrary and capricious as follows:
> "Arbitrary" means fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principal; not done according to reason or judgment, but depending upon the will alone,—absolute in power, tyrannical, despotic, non-rational,—implying either a lack of understanding of or a disregard for the fundamental nature of things.
> "Capricious" means freakish, fickle, or arbitrary. An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles.

---

[6] Because the hearing officer's opinion discussed the prior proceeding, this information clearly was a part of the record before the agency.

15

We find that DOM's promulgation of a regulation that limited Methodist's reimbursement for costs which DOM already had deemed to be reasonable and reimbursable was, definitively, an arbitrary and capricious action by the agency.

¶26. In conclusion, we hold that SPA 2006-006 conflicts with the statutory requirement that a PNFSD be reimbursed as a separate category of nursing facility; therefore, the amendment is void and of no effect. Accordingly, we reverse the decisions of DOM and of the chancery court and we remand this case to the chancery court for further proceedings consistent with this opinion.

## II. WHETHER SPA 2006-006 IS INVALID BECAUSE DOM VIOLATED THE APA OR ITS OWN REGULATIONS.

¶27. Methodist argues that SPA 2006-006 is invalid because DOM's failure to provide notice and an opportunity to be heard, or to follow its own regulatory notice provisions, violated Methodist's right to due process. The Court has already determined in Issue I that SPA 2006-006 is invalid. Therefore, this issue is moot and we do not address it.

## CONCLUSION

¶28. Because SPA 2006-006 conflicts with the statutory requirement that a PNFSD be reimbursed as a separate category of nursing facility, it is void and of no effect. We reverse the decisions of the chancery court and of DOM and remand this case to the chancery court for further proceedings consistent with this opinion.

¶29. **REVERSED AND REMANDED.**

**WALLER, C.J., CARLSON, P.J., KITCHENS AND PIERCE, JJ., CONCUR. DICKINSON, J., CONCURS IN PART AND IN RESULT. RANDOLPH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LAMAR, J. GRAVES, P.J., NOT PARTICIPATING.**

16

**RANDOLPH, JUSTICE, DISSENTING:**

¶30. I dissent from the majority's determination that the Mississippi Division of Medicaid erred in interpreting Mississippi Code Section 43-13-117(44)(b) (Rev. 2004). Giving the agency's interpretation the "great deference" as is proper under our standard of review, I find that the rule is consistent with the statutory language at issue. *See Sierra Club v. Miss. Envtl. Quality Permit Bd.*, 943 So. 2d 673, 678 (Miss. 2006).

¶31. The majority's determination that Medicaid's rulemaking was arbitrary and capricious (as opposed to reflecting sound judgment and common sense) allows Methodist Hospital and Rehabilitation Center unbridled authority to shift costs and set administrative salaries and expenses at its whim, and simply hand the amplified bill to our state's taxpaying citizens' representatives and demand satisfaction of its Brobdingnagian appetite. Is Medicaid to be castigated for its decision and determination that the nursing facility's administrative and operating costs were unreasonable, given that Methodist's overall reimbursement rate was nearly *seven* times greater than that of a standard skilled-nursing facility ("SNF"), and given that Methodist was billing twice the average daily rate of an SNF for administrative and operating costs? Such a decision does not facially appear to be "tyrannical [or] despotic," or "freakish, fickle, or . . . done without reason, in a whimsical manner . . . ." *McGowan v. Miss. State Oil & Gas Bd.*, 604 So. 2d 312, 322 (Miss. 1992). The majority opinion fails to acknowledge that Medicaid properly did not contest the expected enhanced costs for the necessary skills and equipment to serve and care for the needs of Methodist's severely

17

impaired residents. Reimbursements for direct care, therapies, and care-related expenses remain on a basis of cost, plus the applicable trend factors.

¶32. Regarding issue two, Methodist asserts that Medicaid violated the notice requirements of the Administrative Procedure Act ("APA") by failing to send Methodist a copy of the proposed rule change. *See* Miss Code Ann. § 25-43-3.103 (Rev. 2004). However, that provision is inapplicable here; Methodist had never requested to be on the mailing list, as required by the statute. *See* Miss. Code Ann. § 25-43-3.103(2) (Rev. 2004). Assuming arguendo that it applies, the APA does not allow for voiding a rule under these circumstances. *See* Miss. Code Ann. § 25-43-3.111(1) (Rev. 2004) ("Inadvertent failure to mail a notice of proposed rule adoption to any person as required by Section 25-43-3.103(2) does not invalidate a rule"). Of greater import, Methodist was accorded due-process rights for a hearing. Rather than appear and contest this rule, Methodist chose, as was its right, to submit a written complaint to a Medicaid hearing officer, whose decision then required acceptance or rejection by the Executive Director; and finally, by a chancellor. I find this issue to be without merit.

¶33. Methodist raises a third issue in its brief – that Medicaid had violated the notice provisions of its own regulations – but Methodist failed to list this issue in its "Statement of Issues." Thus, we need not consider this issue. *See* M.R.A.P. 28(a)(3). Once again, assuming arguendo, the issue was properly preserved, it is without merit. Medicaid's notice requirements have no provision to invalidate a rule on this basis.

¶34. The chancellor fully considered the issues and found that "Methodist ha[d] not met its burden of proof that the final decision was unsupported by substantial evidence, arbitrary or

capricious, in excess of the statutory authority or jurisdiction of Medicaid, or a violation of any vested constitutional rights of any party involved." The chancellor concluded that his court would "not substitute its own judgment" for that of Medicaid, the agency charged with implementing the statute. This Court should exercise the same restraint, which we have imposed on ourselves previously. *See Elec. Data Sys. Corp. v. Miss. Div. of Medicaid*, 853 So. 2d 1192, 1204 (Miss. 2003) (citing *State Bd. of Psychological Exam'rs v. Coxe*, 355 So. 2d 669, 671 (Miss. 1978)).

¶35. The chancellor found that SPA 2006-006 was not inconsistent with the statutory mandate of Mississippi Code Section 43-13-117(44)(b) (Rev. 2004). The chancellor astutely recognized that Methodist was not subject to any ceilings for direct-care or care-related costs, and that the new ceilings applied only to administrative and operating costs. He noted that the plain language of the statute does not prevent Medicaid from referring to the criteria for other categories of nursing facilities to establish a proper reimbursement formula for Methodist. The chancellor concluded that Methodist was "still treated as a separate class of facility as required by law."

¶36. Our precedent requires us to give "great deference" to statutory interpretations done by administrative agencies concerning their governing statutes. *Sierra Club*, 943 So. 2d at 678. "[N]o court can hope to replicate" an agency's "familiarity with the particularities and nuances of the problems committed to its care . . . ." *Gill v. Miss. Dep't of Wildlife Conservation*, 574 So. 2d 586, 593 (Miss. 1990). Further, "this Court has no right, prerogative, or duty to bend a statute to make it say what it does not say. . . . [C]ourts, judges,

and justices sit to apply the law as it is, not make the law as they think it should be."

*Franklin Collection Serv., Inc. v. Kyle*, 955 So. 2d 284, 288-89 (Miss. 2007).

¶37. The statutory language at issue is silent on the specific issue here. *See* Miss. Code Ann. § 43-13-117(44)(b) (Rev. 2004) ("a separate category of nursing facilities"). The chancellor found that "the plain language to the statute [did] not support [Methodist's] assertion." I agree with this finding. Under the rule, Methodist is not subject to any ceilings for direct-care or care-related costs. Thus, for these costs – those that are increased because of the treatment of severely-disabled patients – Methodist will continue to be reimbursed on a "cost-plus" basis. That is, Methodist will get everything it claims and more, as the total claimed costs are multiplied by a "trend factor."[7] Under the rule, Methodist would be subject only to a ceiling for administrative and operating costs, with no ceiling on costs related to direct care for patients. Medicaid points out that when Methodist was appointed as a provider, effective February 27, 2004, Medicaid set the interim rate based on estimated funding by Methodist, at a daily rate of $487.74 for **all** costs. Ten months later, Methodist submitted its initial cost report projecting $1,106.68, of which $454.42 was for administrative and operating costs. Medicaid accepted the high care costs related to the special-need patients, but at the same time determined that Methodist's administrative and operating costs should be comparable to those of a similarly-sized nursing home.

---

[7]For the year from July 2004 through June, 2005, the trend factors called for the following increases over actual costs: Direct Care, 10.575%; Therapy, 11.125%; Administrative and Operating, 21.775%.

¶38. Methodist argues that the "separate category" language requires that it not be subject to any ceiling, for any of its costs, and that comparison to another type of facility cannot be any part of its reimbursement formula.[8] As the statute is silent, I cannot in good conscience accept Methodist's interpretation. One has to amend the statutory language to get to this desired result. I decline. Methodist accuses Medicaid, unconvincingly, of seeking to add statutory language. Methodist argues that an administrative-and-operating exception should be treated as a separate category. The statute has no such exception. Medicaid has accorded a fair interpretation of the statute, and we, like the chancellor, owe Medicaid's interpretation "great deference."

¶39. Methodist argues also that the statute requires Medicaid to tailor a reimbursement scheme to Methodist's particular role as a private nursing facility for the severely disabled ("PNFSD"). The rule precisely accomplishes the statutory requirement, albeit in a different way than did the prior reimbursement rule, which granted Methodist carte blanche. Methodist was reimbursed for all of its expenses on a "cost-plus" basis, taking into consideration the high costs of the facility's special functions of caring for persons with severe disabilities. Under the new rule, Methodist continues to receive "cost-plus" reimbursement for the high direct-care and care-related costs, subject only to a ceiling for administrative and operating costs.

---

[8]Reference to other categories to compute Methodist's reimbursement is not unprecedented. For one aspect of its reimbursement formula, return on equity, Methodist has been paid at the same rate as other nursing facilities since Methodist first opened its PNFSD.

21

¶40. The majority parrots Methodist's argument that Medicaid's interpretation, if taken to its logical conclusion, would yield absurd results *in futuro*. The claim is that if we defer to this interpretation, nothing would stop Medicaid from placing ceilings on direct-care and care-related costs. Should this imaginary concern develop, we will deal with it when it is properly before the Court. We are precluded from ruling on controversies not presented. *See Gartrell v. Gartrell*, 936 So. 2d 915, 917 (Miss. 2006) (citing *McDaniel v. Hurt*, 92 Miss. 197, 41 So. 381 (1906)).

¶41. The citizens of this state who pick up the tab for government services are entitled to have the expenses monitored by the government they put into power, and not by the whim of a vendor of services. Administrative and operating costs include such items as the salaries and fringe benefits of the administrator and assistant administrator, as well as other labor costs such as: dietary, housekeeping, laundry, maintenance, medical records, and other personnel. Other costs in this category include noncapital amortization and depreciation fees for vehicles. Does Methodist pay its housekeepers, maintenance staff, and laundry workers more than other health-care providers? Is its secretarial staff compensated differently, or its food costs higher, or do they pay a higher rate for their utilities and vehicles? Medicaid certainly has a right, a duty, to analyze these costs. When it does, we should not interfere.

¶42. Should a government agency be prohibited from "tightening its belt," as many Mississippians are having to do during this time of high unemployment and economic uncertainty? Cost control is important to all Mississippians, and is essentially important to the other beneficiaries of Medicaid, our poor and disadvantaged.

¶43. Statistics provided by Medicaid demonstrate the differences between Methodist's reimbursement and those of facilities in other categories: "For skilled nursing facility care, the average per diem reimbursement rate paid by Medicaid is $169.03. . . . At $511.01, Methodist's total rate as calculated by Medicaid is clearly distinguishable from the rates of other nursing facilities."

¶44. Our statute authorizes Medicaid to make payments, including those for the severely disabled, as follows:

> Medicaid as authorized by this article shall include payment of part or all of the costs, at the discretion of the division, with approval of the Governor, of . . . care and services rendered to eligible applicants who have been determined to be eligible for that care and services, within the limits of state appropriations and federal matching funds.

Miss. Code Ann. § 43-13-177 (Rev. 2004). Here, Medicaid adopted a rule concerning administrative and operating costs. The rule change does not result in a ceiling on costs for the patients' care, but affects only the administrative and operating expenses of the facility. The expenses subject to a ceiling are costs that any nursing home expends (accounting fees, bank service charges, dietary supplies, utilities), as well as others that are less essential (educational seminars, travel, and home-office expenses), and those in between (administrative salaries and fringe benefits). Cost cutting, not in violation of a statute, is laudable, and should not be micromanaged by this Court. "[T]he everyday experience of [Medicaid] gives it familiarity with the particularities and nuances of the problems committed to its care [that we cannot] hope to replicate." *Gill*, 574 So. 2d at 593.

23

¶45. Therefore, considering the great deference we should rightly give to an agency's interpretation of its governing statutes, I would affirm the holdings of the administrative hearing officer, Medicaid, and the chancellor.

**LAMAR, J., JOINS THIS OPINION.**